## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

GILBERT CHAVEZ,                    )
                                   )
            Plaintiff,             )
                                   )
vs.                                )          No. CIV 05-286 RB/LCS
                                   )
CITY OF LAS CRUCES,                )
                                   )
            Defendant.             )
                                   )

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** came before the Court on Defendant's Motion for Summary Judgment (Doc. 30), filed on February 20, 2006, Plaintiff's Objections to Defendant's Summary Judgment Evidence and Motion to Strike Evidence (Doc. 41), filed April 14, 2006, and Defendant's Motion to Strike and Objections to Summary Judgment Evidence (Doc. 54), filed May 1, 2006.  Jurisdiction arises under 28 U.S.C. § 1331 (1993), 29 U.S.C. § 626 (1999), and 42 U.S.C. § 2000e-16(c) (2004).

Having considered the submissions, and being otherwise fully advised, I hereby grant Defendant's summary judgment motion, with one exception: Plaintiff's "redlining" discrimination claim is not ripe and, accordingly, is dismissed without prejudice.  As to the parties' motions to strike, they are denied.

## I.      Background.

Except as otherwise noted, the following facts are undisputed or construed in Plaintiff's favor.  *See E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1189 (10th Cir. 2000) (disputed facts must

1

be construed against the party seeking summary judgment).  Plaintiff, who is over the age of 40, is employed by Defendant (City of Las Cruces).  (Pretrial Order 5.)  Plaintiff is a licensed land surveyor.  (Pl.'s Resp. to Def.'s Interrog. # 3 (Plaintiff became licensed by the State of New Mexico in 1980).)  Plaintiff is not a licensed engineer and does not hold an engineering degree.  (*Id*.; Pretrial Order 5.)

Defendant hired Plaintiff in 1990.  (Pretrial Order 5.)  Plaintiff is not a union member and, therefore, is an "unrepresented" employee.  (Pl. Decl. 9.)  Plaintiff is supervised by, *inter alios*, Robert Garza, Director of Defendant's Public Works Department. (Garza Aff. ¶¶1-2 (Public Works Department includes "both Surveying and Engineering Functions").)  Plaintiff's work, throughout his tenure, has been satisfactory. (*Id*.)

Plaintiff will be eligible to retire in approximately 4.25 years.  (Compl. 4.)  Plaintiff's retirement benefits from Defendant are calculated on "his highest three years of pay" during his tenure.  (*Id*. at 5.)

Since 2001, Defendant has had difficulty hiring and retaining qualified licensed engineers.  (Garza Aff. at 1 (Garza stated under oath that his job duties include "oversight of the hiring process for engineers").)  Moreover, Defendant's research indicated that its compensation packages were not competitive with private sector employers, especially for licensed engineers.  (Pl. Decl. Ex. 3.)  Indeed, a market survey recognized that Defendant's "past lump sum across-the-board pay increases" had "negative effects" on its ability to keep pace with compensation offered by private-sector employers.  (*Id*.)

In January 2004, Defendant announced that it was considering replacing its longevity-based system for setting non-union employees' salaries.[1]  In its place, Defendant proposed implementing a merit-based and "market-centered" compensation system.  (Pl. Decl. Ex. 1.)  The proposed Merit Based Compensation

---

[1]Under the previous, longevity-based system, Defendant *automatically* awarded one-step salary "longevity increases" to "full-time, continuous, regular employees" at their "6th, 10th, 15th, and 20th anniversary of employment."  (Pl. Decl. Ex. 24 at 2 (emphasis added) (no definition of "regular employees provided).)

System ("MBCS") called for pay increases to be based, primarily, on: (1) an "employee's annual performance evaluation and their current percentile rank within their respective pay range"; and (2) their position's "current estimated market" strength.  (*Id.*)

Under the MBCS, "employees near the top of their pay grade" would be eligible for merit-based pay increases.  (Pl. Decl. Ex. 3 at 3-4.)  In contrast to the previous longevity-based scheme, however, such increases would only be applied to base pay until they reached an employee's "salary grade maximum."  (*Id.* at 4.)  "Any amount in excess" of that ceiling would be "awarded as a *lump sum payment*" (i.e., it would *not* be added to employees' "base pay").  (*Id.* (emphasis added).)  Thus, the MBCS "redlined" employees regardless of longevity, but allowed merit-based awards that exceeded their given pay range.  (*Id.* at 3 (merit-based awards reevaluated annually).)

On February 9, 2004, Plaintiff asked Robert Garza, Defendant's Public Works Department Director, for "information on the market data and classification" of the "Lead Surveyor" position under the MBCS.  (Pl. Decl. Ex. 5.)  He also expressed his "diagree[ment] with the [proposed] reorganization of the Survey Section."  (*Id.*; Pl. Decl. Ex. 11.)

On March 15, 2004, the City Council of Las Cruces approved the MBCS.  (Pl. Decl. Ex. 3 at 1-2 (Resolution No. 04-303: "A Resolution Amending . . . the Manual of Personnel Policies to Reflect the End of a Longevity-based Compensation System and Implementation of a Market-based Merit Compensation System and its Applicable Policies and Pay Grades") (MBCS to become effective "in July 2004").)  On May 11, 2004, Plaintiff received a "Personnel Action Notice," formally informing him: (1) that his position would change when the MBCS became final in July 2004 (Pl. Depo. Ex. 1); and (2) that he would be

3

directly supervising the Survey Technician staff.[2]  (Pl.'s Resp. Exs. 11, 26.)  Plaintiff remained concerned

that his classification in pay range 24  - as compared with licensed engineers' pay range of 53 - "translate[d]

to a substantial loss of salary and retirement."  (*Id*. at 4-5.)

On June 14, 2004, Defendant formally notified Plaintiff that it had adopted the MBCS.  (Def. Mem.

Mot. Summ. J. Ex. 2.)  It stated that Plaintiff's position became classified in MBCS pay range 24 (entry pay

rate of $17.33 per hour).  (Moquin Aff. ¶15, Ex. 5 (noting that licensed engineers are classified in pay range

53 (entry pay rate of $22.20 per hour).)  As a surveyor, Plaintiff did not receive an "hourly market

adjustment."  (*Id*.; Pl. Decl. Ex. 11 (indicating that Plaintiff's "base rate" salary did not change after being

classified as grade "24").)  But Plaintiff did receive a 2.44% hourly wage increase under the MBCS.  (Pl.

Depo. 27:20-25 ($0.59 longevity adjustment).)  No employee received more than a three-percent pay raise

under the MBCS.  (Def.'s Mem. Mot. Summ. J. at Ex. 5.)

On July 13, 2004, Plaintiff submitted an internal Equal Employment Opportunity ("EEO")

"Discrimination Complaint."  (Pretrial Order 4; Pl.'s Resp. to Def.'s Interrog. # 4.)  Therein, Plaintiff

alleged that he "was discriminated against" on the basis of age by Defendant's adoption of the MBCS.

(Pl.'s Resp. to Def.'s Interrog. # 4.)  On July 15, 2004, Defendant's EEO Officer denied Plaintiff's EEO

complaint.  (Pl. Decl. Ex. 14.)

Also on July 15, 2004 - within two days of Plaintiff's July 13, 2004 EEO Discrimination Complaint -

---

[2]On May 19, 2004, Plaintiff filed an intra-departmental "loss of pay" grievance related to the May 11, 2004 personnel action.  (Pl.'s Resp. to Def.'s Interrog. # 4.)  The grievance did not allege employment discrimination.  (Pl. Depo. Ex. 1; Pl. Depo. 15: 3-19, 16:7-8 (seeking "parity with equivalent classifications with additional considerations for added responsibilities, supervision, and budgeting"); *see also* Pl. Decl. Ex. 26 (Memo. from Garza to Kathy Stark, dated 5/7/2004) (explaining why Plaintiff's salary remained unchanged, despite obtaining supervisory responsibilities, noting that: (1) earlier in Plaintiff's tenure, he had supervised Defendant's Surveying Staff; (2) later, Defendant reorganized the Public Works Department so that the Surveying Staff reported to the "section administrator," instead of Plaintiff, but did not reduce Plaintiff's salary; (3) "[s]ince [Plaintiff] did not lose any pay [when Defendant relieved him of his supervisory duties], I do not believe there should be any changes to his compensation due to the reassignments.").)

Garza requested that Plaintiff prepare a written "summary" of "all the travel [he had] taken" and planned to take during Fiscal Year 2004 related to his "appointment and participation" with two professional organizations. (Pl. Decl. Ex. 13a; Pl.'s Resp. to Def.'s Interrog. # 4 ("first retaliatory incident": Garza's 7/15/04 request for travel documentation).) Garza asked that Plaintiff prepare the report by July 22, 2004. (Pl. Decl. Ex. 13a.)

Garza is responsible for "screen[ing] all travel requests" made by employees in his department to "ensure that the travel" is consistent with Defendant's policies. (Garza Aff. (citing Ex. 1, Defendant's "Travel Authorization and Expense Allowance" policy).) According to Garza, he requested the travel report from Plaintiff because he had "bec[o]me concerned that [Plaintiff] was missing a great deal of work to attend various meetings and conferences." (Garza Aff. 2.)

By July 15, 2004, Plaintiff had served on two professional committees "for nearly a year." (Pl.'s Resp. to Def.'s Interrog. # 4.) It is uncontested that July 15, 2004 was the first time Garza requested that Plaintiff prepare a travel report related to this committee work. (*Id.*)

Plaintiff provided the requested summary to Garza on July 22, 2004. (*Id.*) To comply with Garza's request, however, Plaintiff missed "five weekday lunch periods" and "sleep at night" to assemble the documentation. (*Id.* ("second retaliatory incident": "short time to prepare" travel report).) Plaintiff explained that compiling the travel report proved arduous because the relevant documents were "scattered between [his] office and [his] home." (Pl. Depo. 30:20-25, 31:1-5.)

Plaintiff's July 22 travel report indicated that, between June 2003 and August 2004, Plaintiff had been or "would be" absent twenty-seven workdays. (Pl. Decl. Ex. 13b.) The travel report identified the dates and nature of each event. (*Id.*) Additionally, Plaintiff provided a half-page narrative description of how his FY 2004 involvement with the two professional organizations benefitted Defendant. (*Id.* (noting

that his attendance at these events benefitted the city because he: (1) incorporated conference topics in a "training program" Plaintiff was developing for Defendant's staff; (2) "networked"; (3) brought Defendant recognition (e.g., Plaintiff received "numerous compliments from other municipalities" regarding Defendant's "technological advances"); and (4) received "Professional Development" training).)

On July 30, 2004, Plaintiff learned that Garza wanted him to supplement his July 22, 2006 travel report. (Pl.'s Resp. to Def.'s Interrog. # 4 ("third retaliatory incident": "more work demanded"); Pretrial Order 7.) Specifically, Garza requested that Plaintiff provide a more detailed explanation of how his twenty-seven workday absences "benefit[ted]" Defendant, as well as, specifically, how Plaintiff was "applying the knowledge gained" through this travel to his job. (Pl.'s Resp. to Def.'s Interrog. # 4.)

Plaintiff responded to Garza's request on August 3, 2004. (Pl. Ex. 13c.) In addition to addressing Garza's concerns, Plaintiff indicated that he felt that he was "being singled out and scrutinized where other younger staff are not required to list as an [sic] extensive [travel] summary." (*Id*.) Therein, Plaintiff charged that "[n]o younger individuals were required to submit" a comparably detailed summary, even though "younger individuals . . . ha[d] been recently allowed longer periods of time off to attend 3, 4, and 5 day conferences and their ability to do their job has not been questioned." (*Id*.)

Additionally, Plaintiff's August 3, 2004 memo stated that, even though his request - dated July 12, 2004 - to travel for a August 5-6, 2004 conference had not yet been approved, he planned to attend the event. (*Id*.) Plaintiff stated under oath that, Garza's allegedly retaliatory requests forced him to take annual leave to attend the August 5-6, 2004 event. (Pl.'s Resp. to Def.'s Interrog. # 4 ("I just did not want to go through [that] torment again."); Pl. Decl. Ex. 13b.) The parties agree that Defendant never denied any travel request Plaintiff submitted. (Pl. Depo. 33:1-5; Garza Aff. 3.)

Garza responded to Plaintiff's August 3, 2004 memorandum on August 9, 2004 and expressed his

"extreme[]" disappointment with Plaintiff's "continued resistence" to justify his "apparent[ly] excessive travel." (Pl. Decl. Ex. 13d.)  First, Garza stressed that Plaintiff's travel summary had not explained why his travel was "essential to the performance of the [Public Works] Department's mission," as required by Section IV of City Manager Policy 1.3. (*Id.*) Second, Garza noted that, contrary to Plaintiff's assertion that Garza favored younger employees, Plaintiff had actually received preferential treatment: prior to July 15, 2004, Plaintiff had not been required to submit "post travel reports." (*Id.* ("every [other] employee in the . . . Department" had been required to provide: (1) "justification for travel" before its approval; (2)"detailed trip reports" following travel, which "elaborate on the content of [trip] experiences and how [the travel] . . . translates to their jobs and their ability to perform their jobs more effectively").)

On October 10, 2004, Plaintiff filed two timely Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging: (1) age discrimination in violation of the Age Discrimination in Employment Act of 1967, as amended ("ADEA"), 29 U.S.C. §§ 621-634 (1999) (EEOC Complaint No. 390-2005-00007); and (2) retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17 (2003). (EEOC Complaint No. 390-2005-00008).[3]  The EEOC dismissed both charges on December 14, 2004. (EEOC Dismissal and Notice of Rights: Complaint No. 390-2005-00007;  EEOC Dismissal and Notice of Rights: Complaint No. 390-2005-00008.) On March 16, 2005, Plaintiff timely filed the Complaint in this matter. (Compl. 1.)

## II.    Summary Judgment Standard.

Pursuant to FED. R. CIV. P. 56(c) summary judgment "is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

---

[3]Neither party submitted these documents into evidence.  As a result, the Court, *sua sponte*, requested that counsel submit these documents to "satisfy  itself that the parties have standing to invoke the power of the federal courts."  *See Essence, Inc. v. City of Federal Heights*, 285 F.3d 1272, 1280 (10th Cir. 2002).

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"

*Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000) (quoting FED. R. CIV. P. 56(c)).

Thus, the Court must analyze the "factual record and draw reasonable inferences therefrom in a light most

favorable to the nonmoving party." *See id*.

The moving party shoulders "the initial burden to show that there is an absence of evidence to

support the nonmoving party's case." *Id*. (internal quotation marks and citations omitted). If Defendant,

the moving party here, satisfies this burden, Plaintiff must "identify specific facts that show the existence

of a genuine issue of material fact." *See id*. ("party opposing the motion must present sufficient evidence

in specific, factual form for a jury to return a verdict in that party's favor."). A "fact is 'material' if, under

the governing law, it could have an effect on the outcome of the lawsuit." *Horizon/CMS Healthcare Corp.*,

220 F.3d at 1190. An otherwise well-taken summary judgment motion is not, however, defeated by the

"mere existence of some alleged factual dispute between the parties . . . the requirement is that there be no

genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986).

**III.     Defendant's Motion for Summary Judgment.**

     **A.      Plaintiff's ADEA Discrimination Claims.**

          **1.      Subject-matter jurisdiction: Plaintiff's ADEA disparate-impact claim.**

Defendant argues that this Court lacks subject-matter jurisdiction to hear Plaintiff's ADEA

disparate-impact age discrimination claim. (Pretrial Order 2.) Defendant's arguments are two-fold.

First, as it did in the Pretrial Order, Defendant asserts that Plaintiff failed to exhaust his

administrative remedies as to his disparate-impact claim. (*Id*. (Plaintiff first raised the disparate-impact

theory in his Response to Defendant's summary judgment motion).) Under the ADEA, exhausting

administrative remedies - as to each theory of recovery - is jurisdictional. *See Shikles v. Sprint/United*

*Mgmt. Co.*, 426 F.3d 1304, 1308-09 (10th Cir. 2005); *Foster v. Ruhrpumpen, Inc.*, 365 F.3d 1191, 1194 (10th Cir. 2004) (exhaustion rules "protect employers by giving them notice of [claims and] providing the EEOC with an opportunity to conciliate the[m]"). A plaintiff's failure to exhaust administrative remedies, therefore, "justifies dismissing the case." *Shikles*, 426 F.3d at 1318 (summary judgment inappropriate.)

Yet, to be substantively sufficient for exhaustion purposes, a plaintiff's EEOC charges need not meet an exacting standard. *Foster*, 365 F.3d at 1195 (noting that the Tenth Circuit "liberally construe[s] charges of age discrimination filed with the EEOC")). Indeed, "EEOC regulations explicitly state that 'a charge is sufficient when the Commission receives from the person making the charge a written statement sufficiently precise to identify the *parties*, and to describe generally the *action or practices* complained of.'" *Id.* (emphasis added) (quoting 29 C.F.R. § 1601.12(b)1601.12 (2006)).

Turning to the record, Plaintiff's EEOC Charges satisfy the lenient requirements of 29 C.F.R. § 1601.12(b). *See id.* Plaintiff's EEOC Charges identified the parties involved and generally described the personnel action underlying Plaintiff's disparate-impact claim (i.e., Defendant's implementation of the MBCS). Accordingly, the Court declines to dismiss Plaintiff's ADEA disparate-impact discrimination claim for lack of subject-matter jurisdiction on this ground. *See Shikles*, 426 F.3d at 1306.

Second, Defendant maintains that Plaintiff's disparate-impact claim is not ripe to the extent it raises arguments related to the MBCS's "redlining" feature. (Def.'s Reply 6-10.) Defendant notes that Plaintiff will not become "redlined" - that is, reach the maximum base salary for his pay grade - under the MBCS until December 31, 2006. (Pl.'s Resp. 7.)

Defendant's position is well-taken. *See Initiative & Referendum Inst. v. Walker*, Nos. 02-4105, 02-4123, 2006 WL 1377028, *13 (10th Cir. May 17, 2006) ("In evaluating ripeness the "central focus is on whether the case involves uncertain or contingent future events that may not occur as anticipated, or

indeed may not occur at all.") (internal quotation marks and citation omitted).  Not only is Plaintiff not yet a "redlined" employee, the MBCS protocol provides that the scheme - including pay-range ceilings - is subject to modification and amendment.  (Pl.'s Resp. 13 (noting that, in 2005, Defendant's City Manager indicated his plan to adjust employees' pay ranges that are found to be "below-market" rates).)

As such the Court finds that the issue is not ripe, and subject-matter jurisdiction does not extend to this portion of Plaintiff's disparate-impact theory.  *See Friends of Marolt Park*, 382 F.3d at 1093 n.2 (noting that there are many factors that can be relevant to an issue's ripeness, but using "the two considerations articulated in *Abbott Labs v. Gardner*, 387 U.S. 136 (1967)": (1) "fitness of the issues for decision"; and (2) "the hardship to the parties caused by delay, because these factors are sufficient to guide our decision").  To that extent, Defendant's summary judgment motion is denied and Plaintiff's claim is dismissed.[4]  *See Friends of Marolt Park*, 382 F.3d at 1093.

### 2.      Plaintiff improperly raised his ADEA discrimination claims.

Defendant maintains that, in any case, the Court should decline to hear Plaintiff's ADEA discrimination claims.  (Pretrial Order 2 (Defendant properly preserved objection); Def's Reply at 2-3 (same).)  Specifically, it argues that Plaintiff: (1) improperly raised his disparate-impact claim in his summary judgment response; and (2) waived his disparate-treatment claim by failing to include it in the Pretrial Order.  (Def.'s Reply at 2.)  This Court's "inherent authority" to "manage its own docket includes the discretion to determine which claims to consider."  *Sipp v. Unumprovident Corp.*, Nos. 03-2055, 03-2066, 107 F. App'x 867, 875 (10th Cir. 2004) (unpublished) (citing *Hartsel Springs Ranch of Colo., Inc. v. Bluegreen Corp.*, 296 F.3d 982, 985 (10th Cir. 2002)).

---

[4]Regardless of how MBCS's "redlining" feature affects older employees, Plaintiff's disparate-impact claim could not survive summary judgment.  *See infra* Part V.A.3.

The first time Plaintiff clearly articulated a disparate-impact theory of recovery under the ADEA was in his April 14, 2006 Response to Defendant's Motion for Summary Judgment.[5]  (Pl.'s Resp. Ex. B.)  Even under the Federal Rules' "liberalized" pleading standards, plaintiffs are "not permit[ted]" to "wait until the last minute to ascertain and refine the theories on which they intend to build their case."  *Elliott Indus. Ltd. v. BP Am.  Prod. Co.*, 407 F.3d 1091, 1121 (10th Cir. 2005).  Indeed, "[t]his is particularly true if permitting a plaintiff to change  its theory will prejudice the other party in maintaining its defense."  *Id.* (plaintiff "had never asserted in its complaint that this was a basis for liability and to permit [it] to make this claim at such a late stage in the proceedings would risk prejudicing BP [defendant]").  In light of these controlling legal principles, it is clear that Plaintiff improperly raised his ADEA disparate-impact theory.

By contrast, Plaintiff arguably abandoned his disparate-treatment claim in the Pretrial Order.  (*Compare* Pretrial Order 3 (failing to indicate that Plaintiff was proceeding on a disparate-treatment theory), *with* Initial Pretrial Report 2 (indicating only that Plaintiff was asserting an ADEA disparate-*treatment* challenge.)  "It goes without saying" that the Pretrial Order, which supercedes the parties' pleadings, "controls the scope and course of trial; a claim or issue not included in the order is waived."  *Arsement v. Spinnaker Exploration Co.*, 400 F.3d 238, 245 (5th Cir. 2005); *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) ("claims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint").  *Accord* FED. R. CIV. P. 16(e) ("Th[e] [pretrial] order shall control the subsequent course of the action . . . .").

Clearly, the difference between a disparate-treatment and disparate-impact theory is material for

---

[5] Even though Plaintiff is now represented by counsel, he filed the Complaint pro se.  Accordingly, Plaintiff is entitled to a liberal reading of that pleading: the Complaint is subject to a less stringent standard than if it had been drafted by an attorney.  *Gillihan v. Shillinger*, 872 F.2d 935, 938 (10th Cir. 1989). The Court is aware that it may not assume the role of advocate for pro se litigants, *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991), and that pro se litigants must follow the same rules of procedure that govern other litigants.  *Okla. Gold & Federated Numismatics, Inc. v. Blodgett*, 24 F.3d 136, 139 (10th Cir. 1994).

discovery and litigation-strategy purposes.  (*See* Pl. Depo. (Plaintiff's deposition taken by Defendant April

6, 2006 - same day Plaintiff signed the Pretrial Order).)   Discovery in this case was closed by April 14,

2006.  (*See* Order (Doc. 28); Initial Pretrial Order at 3.)   Plaintiff never expressly moved to amend the

Complaint, Initial Pretrial Report, or Pretrial Order to clarify his claims.[6]   Moreover, *two* settlement

conferences were held in this matter before Plaintiff's April 14, 2006 summary judgment response, which

first set forth his disparate-impact theory of ADEA discrimination, and the May 8, 2006 Pretrial Order.

(Pretrial Order 20.)

   Undoubtedly, the desultory manner in which Plaintiff conducted this litigation wasted scarce judicial

resources and proved costly to Defendant.  The Court admonishes Plaintiff for thwarting the letter and spirit

of the Federal Rules of Civil Procedure by failing to clarify the nature of his ADEA discrimination claims.

Nevertheless, Plaintiff's ADEA disparate-impact and disparate-treatment claims will be disposed of on the

merits because the Court finds that doing so will: (1) not prejudice Defendants; and (2) serve judicial

economy.  *Sipp*, 107 F. App'x at 875.

### 3.    Disparate-impact claim.

   Turning first to Plaintiff's ADEA disparate-impact claim, it is clear that it cannot withstand

Defendant's motion.  Defendant is entitled to summary judgment.

### a.    ADEA disparate-impact claims after *Smith v. City of Jackson*.

   The Tenth Circuit has explained disparate-impact claims as follows:

   A claim of disparate impact, unlike a claim of disparate treatment, does not require a finding

---

   [6]Although in the Tenth Circuit "the inclusion of new allegations in a response to a motion for summary
judgment, [is treated] as a potential request to amend the complaint," *Martinez v. Potter*, 347 F.3d 1208, 1211
(10th Cir. 2003), this "rule does not preclude" the party moving for summary judgment "from notice and an
opportunity to be heard on whether an amendment should be permitted."  *Id.* ("a request to amend may be denied
where the new theory would prejudice the moving party").

of intentional discrimination. To the contrary, the entire necessary premise of the disparate impact approach is that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination.

*Pippin*, 440 F.3d at 1199 (internal quotation marks and citations omitted). "'[T]he ADEA does authorize recovery in 'disparate-impact' cases.'" *Id.* (quoting *Smith*, 544 U.S. at 240). At the same time, it is clear that "the 'scope of disparate-impact liability under [the] ADEA is narrower than under Title VII.'" *Id.*

In *Smith v. City of Jackson*, 544 U.S. 228 (2005), the Supreme Court concluded that the "narrower pre-1991 interpretation of disparate- impact liability" it "articulated in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989), 'remains applicable to the ADEA.'" *Pippin*, 440 F.3d at 1199 (quoting *Smith*, 544 U.S. 240-41). Under *Wards Cove*, to establish a prima facie disparate-impact discrimination claim, Plaintiff must show "'that a *specific* identifiable employment practice or policy caused a *significant* disparate impact on a protected group.'" *Id.* (emphasis added) (quoting *Ortega v. Safeway Stores, Inc.*, 943 F.2d 1230, 1242 (10th Cir.1991), and citing *Wards Cove*, 490 U.S. at 655-56). Moreover, as the Tenth Circuit clarified, the *Wards Cove* standard requires that:

an employee . . . point to both a significant disparate impact and to a *particular* policy or practice that caused the disparity . . . it is *not enough* to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact.

*Id.* (second emphasis added) (internal quotation marks and citations omitted). Therefore, following *Smith*, making a prima facie disparate-impact showing requires an employee to "'isolat[e] and identify[] the specific employment practices that are allegedly responsible for any observed statistical disparities.'" *Id.* (quoting *Smith*, 544 U.S. at 240-41).

If the plaintiff "establishes a prima facie case of disparate impact age discrimination under the ADEA, the burden of production shifts to the employer to assert that its neutral policy is based on

13

reasonable factors other than age." *Id*. This "reasonable factors other than age" ("RFOA") exception is derived from the ADEA itself:

> It shall not be unlawful for an employer, employment agency, or labor organization to take any action otherwise prohibited . . . where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business, or where the differentiation is based on reasonable factors other than age.

29 U.S.C. § 623(f)(1) (emphasis added).  Thus, RFOA "significantly limits an employer's potential liability for disparate impact under ADEA." *Pippin*, 440 F.3d at 1099 (quoting *Smith*, 544 U.S. at 233).

If an employer articulates a RFOA, "to prevail on an ADEA disparate impact claim, an employee must ultimately persuade the fact finder that the employer's asserted basis for the neutral policy is *unreasonable*." *Id*. (emphasis added).  But, notably, it is clear that:

> The test is *not* whether there were other more narrowly tailored ways for the employer to achieve its legitimate business goals. Instead, the *employee must show that the method selected was unreasonable*.

*Id*. (emphasis added) (internal quotation marks and citations omitted).

The *Smith* case's application of the RFOA exception is illustrative.  There "the disparate impact attributable to the City's pay plan was a result of":

> . . . [its] decision to give raises based on seniority and position. Reliance on seniority and rank is unquestionably reasonable given the City's goal of raising employees' salaries to match those in surrounding communities. In sum, we hold that the City's decision to grant a larger raise to lower echelon employees for the purpose of bringing salaries in line with that of surrounding police forces was a decision based on a "reasonable factor other than age" that responded to the City's legitimate goal of retaining police officers.

*Id*. (quoting *Smith*, 544 U.S. at 233).

>    b.    **Even if Plaintiff evidenced a prima facie disparate-impact claim, Defendant is entitled to summary judgment under the RFOA defense.**

Here, as in *Smith*, even assuming, *arguendo*, that the MBCS had a disparate impact on older

14

employees, the record is plain: Defendant implemented the MBCS based on "reasonable factors other than age." *See id*. Primarily, Defendant did so to:

> [1] Attract[] and retain[] quality staff; [2] Invest[] in Performance; [3] Achiev[e] an appropriate environment of equity; [4] Link[] and maintain[] competitive market positions; [5] Encourag[e] the development of knowledge, skills, and abilities; and [6] Utiliz[e] financial and human resources efficiently and effectively.

(Pl. Decl. Ex. 3 at 1-2.)  Moreover, in implementing the MBCS, Defendant used four factors to "establish the value of jobs" and assign them to a pay range: (1) depth of knowledge and skill required; (2) whether the position involved personnel responsibilities; (3) level and complexity of problem solving demanded; and (4) "accountability." (Pl. Aff. Ex. 1.)  Defendant established each pay range's salary continuum by assessing the:

> (1) Uniformity of pay for each class; (2) Relative difficulty and responsibility of positions; (3) Prevailing wages within the identified relevant public and private sectors; (4) Cost of living index; (5) Financial policies of the municipality; (6) Difficulty in recruiting suitable employees; (7) Other economic considerations.

(Def.'s Mem. Mot. Summ. J. Ex. 1.)

None of these factors are age-related.  Moreover, they are imminently reasonable.  In any event, Plaintiff failed to establish that they were *unreasonable*.  *Pippin*, 440 F.3d at 1099 ("[To prevail,] the employee must show that the method selected was *unreasonable*." (emphasis added)); *see generally id*. (noting the "ADEA test for disparate impact departs from the *Wards Cove* [Title VII "business necessity"] analysis in this regard.").

Accordingly, Defendant did not violate the letter or spirit of the ADEA in replacing its longevity-based compensation with the MBCS, market-based merit compensation initiative.  *See id*. Defendant is entitled to summary judgment on his disparate-impact theory of ADEA discrimination.  *See Munoz*, 221 F.3d at 1164 (quoting FED. R. CIV. P. 56(c)).

15

### 4.   Disparate-treatment claim.

Likewise, Plaintiff's ADEA disparate-treatment claim cannot withstand Defendant's summary judgment motion. *See id.* The ADEA makes it "unlawful for an employer" to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Accordingly, Plaintiff's disparate-treatment claim turns on whether age "actually motivated the employer's decision." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) (internal quotation marks and citation omitted). "That is, the plaintiff's age must have 'actually played a role in the employer's decisionmaking [sic] process and had a determinative influence on the outcome.'" *Id.* (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)).

To make this showing, Plaintiff may rely on circumstantial evidence, as structured by the *McDonnell Douglas* analysis. *Id.* (assuming, without deciding, that the *McDonnell Douglas* framework applies to Title VII and ADEA claims). The Tenth Circuit has explained *McDonnell Douglas*'s framework as follows:

> The plaintiff must carry the initial burden under the statute of establishing a prima facie case
> . . . . Once the plaintiff has established a prima facie case, the burden then must shift to the
> employer to articulate some legitimate . . . reason for its employment action. If the
> defendant makes this showing, the plaintiff must then show that defendant's justification is
> pretextual.

*Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000) (Title VII) (internal quotation marks and citations omitted).

Plaintiff may satisfy the "requirements of a prima facie claim of disparate treatment" by producing evidence that establishes: (1) he is "a member of a protected class"; (2) he "was disciplined" or otherwise subject to adverse employment action; and (3) an inference of age discrimination. *See MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1277 (10th Cir. 2005); *see also Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173 (10th Cir. 2005) (Title VII) (prima facie showing requires "a showing of circumstances

16

giving rise to an inference of discrimination"). The third-prong can be satisfied where plaintiff demonstrates that he "was treated differently than similarly-situated non-protected employees for the same or similar conduct." *MacKenzie*, 414 F.3d at 1277.

It is undisputed that Plaintiff satisfied the first prima facie requirement: he is an individual over age forty and, thus, a member of the protected class under the ADEA. (Pretrial Order 5.) Yet, even assuming, without deciding, that the MBCS constituted an adverse employment action, *see Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998), it is clear that Plaintiff cannot establish the requisite inference of age discrimination. *MacKenzie*, 414 F.3d at 1277.

First, it bears underscoring that the plan is facially neutral and affected all Defendant's unrepresented employees' job and salary classifications. True, Plaintiff produced evidence - namely, the Clark Study - that demonstrated that the MBCS applied to more employees over the age of forty, than under the age of forty, because more of Defendant's non-unionized employees are more than forty years of age. (Clark Decl. ¶10.) But, clearly, without more, Plaintiff's statistics "do not demonstrate discrimination." *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526 (10th Cir. 1994) (citation omitted). Accordingly, they are "insufficient to raise a jury question on the ultimate question of age discrimination." *Id*. (internal quotation marks and citation omitted).

Second, in the Tenth Circuit, "[i]ndividuals are considered 'similarly-situated' when they":

(1) have dealt with the same supervisor; (2) were subjected to the same work standards; and (3) [] engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*MacKenzie*, 414 F.3d at 1277; *cf. Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997) (Title VII) (noting, in considering whether defendant discriminatorily approved employees' leave under a *seniority-based* scheme, that "similarly situated" employees must be "subject to the same standards

17

governing performance evaluation and discipline" (emphasis added)).

Here, the record reflects that Plaintiff's "comparison" to younger engineers is legally irrelevant. *See MacKenzie*, 414 F.3d at 1277. Plaintiff is trained and employed as a surveyor, not as an engineer. (Pretrial Order 5; Pl.'s Resp. to Def.'s Interrog. # 3.) Review of Defendant's job descriptions makes clear that engineers and surveyors perform different job duties and are required to have different job qualifications. Engineers must hold a "Bachelor of Science in Engineering" and be "New Mexico Registered Professional E]ngineers]." (Def.'s Mem. Mot. Summ. J. Ex. 3.) By contrast, surveyors employed by Defendant must hold "[New Mexico] Professional Surveyor licensure." (Def.'s Mem. Mot. Summ. J. Ex. 4.)

Moreover, contrary to Plaintiff's litigation position, surveyors and engineers do not hold materially similar professional licenses. *Compare* N.M. STAT. ANN. § 61-23-14.1 (Mitchie 2006) (requiring, *inter alia*, graduation from "a board-approved, four-year engineering curriculum" coupled with at least "twelve years of engineering experience subsequent to the awarding of the degree), *with* N.M. STAT. ANN. § 61-23-27.4 (Mitchie 2006) (requiring, *inter alia*, "four years of board-approved surveying experience if graduated from a four-year, board-approved surveying curriculum"). Plaintiff himself - in a published article - has explained how and why engineering and surveying are distinct professions. (Garza Aff. Ex. C at 1 (Gilbert Chavez, *Supplemental Survey Work, What's That?*, NMBLE BOARD ROOM NEWS, Sept. 2005, at 1, 3) ("Surveying is often associated with Civil Engineering [but] . . . the two professions are distinct . . . .").) Therefore, the fact that Defendant did not place Plaintiff in the same pay grade or otherwise pay Plaintiff like its engineers under the MBCS is not legally relevant.[7]

---

[7]Nor, is the fact that Defendant adjusted other job positions' pay ranges between the time it proposed the MBCS in January 2004 and implemented it in July 2004, but declined to adjust Plaintiff's pay range, to the contrary. Plaintiff simply produced no evidence demonstrating that Defendant's actions were precipitated by age-based discrimination.

Even if Plaintiff had stated a prima facie claim, the record reflects that Plaintiff failed to evidence that Defendant's legitimate rationales for implementing the MBCS - i.e., adopting a market-based and merit-based approach to, *inter alia*, make it better able to retain qualified engineers - were "pretextual" in any regard.  *See Kendrick*, 220 F.3d at 1226.  The record is also devoid of any evidence that Defendant classified Plaintiff based on age-related factors or otherwise discriminated against Plaintiff based on his age.  As such, Defendant is entitled to summary judgment on both Plaintiff's ADEA discrimination claims.  *See Munoz*, 221 F.3d at 1164 (quoting FED. R. CIV. P. 56(c)); *see also supra* Part V.A.3.

**B.     Plaintiff's ADEA retaliation claim.**

While Plaintiff's pleadings, filings, and contentions set forth in the Pretrial Order are not models of clarity, it appears that Plaintiff asserts an ADEA retaliation claim.[8]  (Compl. 2; Pretrial Order 5.)  "To establish a retaliation claim, [Plaintiff] must demonstrate []he engaged in activity statutorily protected under the ADEA, 29 U.S.C. § 623(d)."  *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1213 (10th Cir. 2003).  Section § 623(d) of the ADEA makes clear that protected activity includes "opposing or complaining about age discrimination by [Defendant]."  *See id.*

Stating a prima facie case of ADEA retaliation requires Plaintiff demonstrate that:

1) he availed himself of a protected right under the ADEA, such as opposing an employer's discrimination on the basis of age; 2) he was adversely affected by an employment decision; and 3) a causal connection between the two actions.

*Webb v. Level 3 Commc'ns, LLC*, No. 05-1051, 167 F. App'x 725, 734 (10th Cir. Jan. 25, 2006) (unpublished) (citing *MacKenzie*, 414 F.3d at 1278-79).  It is undisputed that Plaintiff engaged in protected activity in filing his October 10, 2004 EEOC Charges alleging age discrimination.  Whether Plaintiff stated a prima facie retaliation claim, therefore, turns on the second and third prongs of the analysis.  *See id.*

---

[8]Defendant did not object to Plaintiff's ADEA retaliation claim in this regard.  (Pretrial Order 5.)

19

Here, however, the Court need only reach the second stage of the prima-facie showing.  To establish an "adverse employment action," a "plaintiff must show that a reasonable employee would have found the challenged action *materially a*dverse, 'which in this context means it well might have 'dissuaded a *reasonable* worker from making or supporting a charge of discrimination.'"  *See Burlington N. & S.F. Ry. Co. v. White*, No. 05-259, 2006 WL 1698953, at *10 (June 22, 2006) (emphasis added) (citation omitted) (Title VII).  This is an "objective" standard that demands a case-by-case determination.  *Id*.  Therefore, "the anti-retaliation provision protects an individual not from all retaliation, but from *retaliation that produces an injury or harm*."  *See White*, 2006 WL 1698953, at *10 (emphasis added) ("Title VII, we have said, does not set forth "a general civility code for the American workplace."); *see generally id*. ("We agree with the [adverse employment action] formulation set forth by the Seventh and the District of Columbia Circuits."); *Rochon v. Gonzales*, 438 F.3d 1211, 1217 (D.C. Cir. 2006) ("The anti-retaliation provision of the ADEA . . . closely tracks the cognate provision of Title VII"), *cited with approval in White*, 2006 WL 1698953, at *10.

Turning to the record, Plaintiff failed to show that any of Defendant's allegedly retaliatory conduct amounted to adverse employment action.  Plaintiff serves on the New Mexico Board of Licensure for Professional Engineers and Professional Surveyors ("NMBLE") and is a delegate to the National Council of Examiners for Engineering and Surveying ("NCEES").  (Pl.'s Resp. to Def.'s Interrog. # 4.)  It is undisputed that Plaintiff missed twenty-seven work days in FY 2004 to attend NMBLE and NCEES events. (Pl. Depo. 34:1-25, 35:1-11.)

On July 24, 2003, Plaintiff informed Garza that the Governor had renewed his appointment to the NMBLE.  (Pl.'s Resp. Ex. 12.)  In that memorandum, Plaintiff also explained that he requested "Governmental/Professional Leave to attend scheduled [NMBLE] meetings for Fiscal Year [20]04" and

20

two NCEES meetings.  (*Id.* (noting that his attendance at these meetings "fulfill the Professional Development Hours required for Licensure").)  Garza approved Plaintiff's requested professional leave, but stated that he would "still need a travel request for each occurrence."  (*Id.* (hand-written comments initialed "R.G.").)

Plaintiff maintained that each of the following actions, taken by Garza, constituted adverse employment action: (1) Garza's July 15, 2004 request for travel documentation (Pl.'s Resp. to Def.'s Interrog. # 4 ("first retaliatory incident")); (2) Garza's requirement that Plaintiff produce the travel documentation by July 22, which caused Plaintiff to missed "five weekday lunch periods" and "miss sleep at night" (*Id.* ("second retaliatory incident": "short time to prepare data")); (3) Garza's August 3, 2004 request that Plaintiff supplement the travel report he submitted to Garza July 22.  (*Id.* ("third retaliatory incident": "more work demanded" by Garza).)  He also seems to suggest that being required to take annual leave for his travels was adverse employment action.  For the reasons stated below, however, none of these incidents amounted to adverse employment action.  *See MacKenzie*, 414 F.3d at 1278-79.

It is clear from that Garza acted pursuant to Defendant's travel-policy protocol (Garza Ex. 1 (Defendant's "Travel Authorization and Expense Allowances" policy)) in requesting Plaintiff provide documentation prior to approving the August 5 and 6 travel request.  In any case, missed lunch hours and requests for documentation for one memorandum regarding twenty-seven work-day absences do not amount to adverse employment action.  *Cf. White*, 2006 WL 1698953, at *13 (respondent suspended, without pay, for thirty-seven days after she made a sexual harassment complaint).  These incidents effected no "material" harm to, or otherwise changed in a non-trivial manner, Plaintiff's employment position (e.g., it is uncontested that he was never denied a travel request).  *See id.* at *10.  Therefore, "in this context," Garza's requests for the travel report - which resulted in Plaintiff producing four pages in documentation

- would not "have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *See id*. As such, Plaintiff failed to state a prima facie ADEA retaliation claim and Defendant is entitled to summary judgment on this claim. *See id*.; *see Munoz*, 221 F.3d at 1164.

### C.    Plaintiff's Title VII Claim.

The Court of Appeals for the Tenth Circuit is clear: a plaintiff suing under Title VII "must 'exhaust administrative remedies for each [allegedly unlawful] individual discriminatory or retaliatory act.'" *See Duncan v. Manager, Dep't Pub. Safety*, 397 F.3d 1300, 1314 (10th Cir. 2005). Here, while Plaintiff expressly alleged only age-related retaliation, his EEOC charge alleged that Garza's mandate that he prepare the travel memoranda violated Title VII. (EEOC Complaint No. 390-2005-00008.) The Court finds, therefore, that Plaintiff exhausted his administrative remedies related to Title VII retaliation. *See Duncan*, 397 F.3d at 1314 ("written statement" need only "identify the parties" and "action or practices complained of") (internal quotation marks and citation omitted).

Yet, even though this Court has subject-matter jurisdiction, Title VII is inapplicable. Title VII makes it unlawful for an employer to discriminate against any individual with respect to the compensation, terms, conditions, or privileges of employment on the basis of *race or gender*. *See* 42 U.S.C. § 2000e-2(a)(1); *Jaramillo v. Colorado Judicial Dep't*, 427 F.3d 1303, 1306 (10th Cir. 2005) ("To prevail on a disparate treatment claim under Title VII, a plaintiff must show that his employer intentionally discriminated against him for a reason prohibited by the statute."). Retaliation against an employee who engages in *protected* Title VII activity is also proscribed under the Act. *See* 42 U.S.C. § 2000e-3(a). Neither *age* discrimination, nor EEO activity related to age discrimination, are proscribed by Title VII. *See Smith*, 544 U.S. at 233.

Although Plaintiff is a Hispanic male (Pl. Decl. at 1), Plaintiff never averred that Defendant's MBCS

22

discriminated against him on the basis of race or gender.  (*E.g.* Pretrial Order 5.)  To the contrary, Plaintiff

exclusively alleged - in his internal grievance, EEO Charge, Complaint, and motion papers - that Defendant

acted unlawfully in discriminating against him on the basis of *age*.  Bare citation to Title VII is not enough,

in this case, to survive summary judgment.  Without any allegation, let alone record evidence, of race- or

gender-based discrimination, Defendant is entitled to summary judgment on Plaintiff's Title VII retaliation

claim.  *See Munoz*, 221 F.3d at 1164 (quoting FED. R. CIV. P. 56(c)).

**IV.    The Parties' Motions to Strike Will Be Denied.**

The parties, in their respective motions to strike, moved to exclude evidence not implicated by the

Court's Memorandum Opinion and Order, with one exception.  Plaintiff's Motion to Strike objected to

Garza's Affidavit Exhibit 1 (Defendant's travel policy).  (Pl.'s Mot. Strike at 2.)  Specifically, he argued

that the exhibit is unauthenticated and contains hearsay.  (*Id.*)

First, Plaintiff's authentication argument fails.  Under the Federal Rules of Evidence, "The

requirement of authentication or identification . . . is satisfied by evidence sufficient to support a finding that

the matter in question is what its proponent claims."  FED. R. EVID. 901(a).  Here, Garza had personal

knowledge of the travel policy and, thus, the exhibit is not unauthenticated: as department head he was

familiar with the policy and was responsible for its enforcement.  (Garza Aff. 2.)

Second, Plaintiff's hearsay objection is not well taken.  *See* FED. R. EVID. 801-802.  Defendant notes

that the travel policy is offered, not for the truth of the matter asserted, but rather to show that it existed

in July 2004 and August 2004.  (Def.'s Resp. to Pl.'s Mot. to Strike at 10-11.)  In any event, it appears that

Defendant's travel policy is also proper summary judgment evidence pursuant to the "public records and

reports" exception to the hearsay rule.  *See* FED. R. EVID. 803(8).  Accordingly, Plaintiff's objection to

Garza Affidavit Exhibit 1 is overruled, and the parties' motions to strike are otherwise denied.

**V.      Conclusion.**

For the foregoing reasons, Defendant's Motion for Summary Judgment will be **granted in part** and **denied in part**.  *See Munoz*, 221 F.3d at 1164 (quoting FED. R. CIV. P. 56(c)).  It is granted in all respects, except Plaintiff's "redlining" ADEA discrimination claim, which is **dismissed without prejudice**.  *See Friends Of Marolt Park*, 382 F.3d at 1093-94.  The parties' motions to strike are **denied**.

**IT IS SO ORDERED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**